**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

KIM RAYMOND FEASTE,
Plaintiff,

v.

FLOCK GROUP, INC. d/b/a FLOCK SAFETY,
Defendant.

Civil Action No.: ________________

**COMPLAINT FOR DAMAGES**
**(DIVERSITY JURISDICTION) AND DEMAND FOR JURY TRIAL**

Plaintiff Kim Raymond Feaste, proceeding pro se, alleges the following:

## I. NATURE OF THE ACTION

1. This is an individual action for damages against Flock Group, Inc., doing business as Flock Safety ("Flock"), for its own alleged negligent design and operation of a hosted automated license plate recognition ("ALPR") search service, its alleged breach of applicable Georgia protective duties, and its own alleged processing and disclosure of private travel-history information. Flock is the sole Defendant. Plaintiff does not assert a Georgia Open Records Act enforcement claim in this action.

2. The gravamen is not the ordinary observation of a visible license plate. Plaintiff challenges the use of a multi-agency hosted service to retrieve stored observations of his separate personal vehicle, allegedly for retaliatory and

non-law-enforcement purposes, with inadequate validation, anomalous-use review, and escalation safeguards despite a foreseeable risk of credentialed-user abuse.

3. Flock is sued for its own platform design, hosting, retrieval, access-control, and records-custody conduct. Plaintiff does not allege that Flock wrote threatening letters, fabricated an investigative report, made defamatory statements, knew Plaintiff personally in 2025, joined a conspiracy with law-enforcement officers, or shared any officer's alleged retaliatory motive merely because the platform was used.

4. A distinct federal action involving individual law-enforcement defendants, Feaste v. Peavy et al., No. 5:26-cv-00204-MTT (M.D. Ga.), concerns the officers' own alleged misconduct. This complaint is a separate state-law action against Flock alone and expressly disclaims duplicative damages for the same injury.

## II. PARTIES, DIVERSITY JURISDICTION, AND VENUE

5. Plaintiff Kim Raymond Feaste is an adult United States citizen domiciled in Florida. Florida is his permanent home, and he intends to remain domiciled there. Plaintiff alleges Florida citizenship as of commencement of this action, not citizenship based merely on a mailing address or temporary physical presence. His citizenship is different from each State of citizenship of Flock.

6. Defendant Flock Group, Inc. is a corporation incorporated in Delaware and has its principal place of business in Atlanta, Georgia. On information and belief, Atlanta is the actual center from which its officers direct, control, and coordinate its corporate activities, not merely a registered-agent or mailing location. Flock is therefore a citizen of Delaware and Georgia under 28 U.S.C. § 1332(c)(1). See Hertz Corp. v. Friend, 559 U.S. 77, 92-93 (2010). Its commercial use of the name Flock Safety does not create a separate defendant. The Georgia Secretary of State's business-search listing identifies Flock's principal office as 3284 Northside Pkwy NW, Suite 150, Atlanta, Georgia 30327. Exhibit Q.

6A. Flock may be served through its Georgia registered agent, Registered Agents Inc., at its Georgia service office, 8735 Dunwoody Place, Suite R, Atlanta, Georgia 30350. The Georgia Secretary of State's business-search listing for Flock Group Inc, control number 17023823, identifies Registered Agents Inc as its registered agent. The agent's Georgia office address is separately confirmed in the Federal Motor Carrier Safety Administration's published process-agent directory. Exhibit Q. Plaintiff requests service of this Court's issued summons and this complaint under Federal Rule of Civil Procedure 4(h)(1)(B).

7. This Court has original subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Complete diversity exists between Plaintiff, a Florida citizen, and

the sole Defendant, a Delaware and Georgia citizen. All three counts assert state-law tort theories against Flock. No county, sheriff, officer, or other party to the related litigation is joined here. Jurisdiction does not depend on a federal-question claim, supplemental jurisdiction, or an Open Records Act claim.

8. The amount in controversy against Flock alone exceeds $75,000, exclusive of interest and costs. Plaintiff makes that allegation in good faith based on the alleged repeated invasion of his historical-location privacy, its duration and consequences, and the sustained injuries described in paragraphs 63-66. The demand includes general damages for the intentional privacy tort in Count III, associated treatment expenses where recoverable, and punitive damages only where independently authorized and compatible with the governing damages measure. It does not depend on treating psychological-treatment bills as an independent pecuniary loss sufficient to avoid the ordinary-negligence impact rule. Alternative counts concern the same injury and are not added together to multiply its value.

9. The alleged injury is concrete and personal: loss of privacy and control over accumulated travel-history information, disrupted sleep and ordinary activities, and sustained distress for which Plaintiff alleges psychiatric care beginning July 6, 2026 and therapy beginning July 13, 2026. Plaintiff seeks damages proximately attributable to Flock under the distinct requirements of

each count. He does not use damages demanded from officers in another case, statutory records penalties, his own pro se legal time, or a per-camera or per-query multiplier to satisfy § 1332. The intentional-intrusion damages theory is pleaded separately from the limitations governing ordinary negligence; neither theory is an adjudicated valuation of his claim.

10. This Court has personal jurisdiction over Flock under Federal Rule of Civil Procedure 4(k)(1)(A), upon effective service or waiver of service, because Flock is at home in Georgia, where its principal place of business is located. See Daimler AG v. Bauman, 571 U.S. 117, 137 (2014). The fact that its headquarters are in another federal district within Georgia does not confine Georgia-based personal jurisdiction to that district. The district-specific venue grounds are alleged separately below.

11. Flock purposefully furnished and operated the challenged hosted search and retrieval service for agency accounts in this District, including Bibb and Monroe and the Dooly-associated access described below. Bibb's July 2, 2026 production includes a 2023 agreement naming "GA - Bibb County SO" at a Macon address, with a 36-month initial term, recurring platform service, 100 Falcon cameras, and 50 Wing gateways. The order form bears the customer's September 7, 2023 signature and Flock's September 9, 2023 signature. Its feature schedule expressly describes nationwide license-plate lookup, historical-location lookup, and user/network auditing. Exhibit

L, source pp. 2, 4, 6. Together with the recorded Bibb searches, that agreement supports Plaintiff's allegation that Flock actually and deliberately performed the relevant hosted service for this local customer during the challenged period. The agency records, affidavit, and testimony independently identify the connected searches. Exhibits A, B, and H. This is a claim-related, continuing service relationship, not merely the availability of a general website.

12. Venue is proper under 28 U.S.C. § 1391(b)(1), (c)(2), and (d). For corporate venue purposes, Flock's deliberate, claim-related provision of the challenged service to agency operations in this District supplies contacts sufficient for specific personal jurisdiction if this District were a separate State. Each count arises out of or relates to that same service, the searches performed through it, and the safeguards governing those searches. See Ford Motor Co. v. Montana Eighth Judicial District Court, 592 U.S. 351, 359-60 (2021). Flock accordingly resides here for purposes of these claims, and it is the only Defendant. Plaintiff does not equate Georgia corporate citizenship, standing alone, with residence in every Georgia federal district.

13. Independently, venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to each claim occurred in this District. The identified transactions include the May 7, 2025 Bibb-account search requested by Dooly; further Bibb-account activity on

June 2, 2025; the Dooly-associated "R. Esc" searches; and the Monroe-account activity in November 2025. Exhibits A and B identify the agency accounts and the Dooly-to-Bibb request, and Exhibit H identifies Richard Eschenbach's Dooly role. Based on those agency operations and records, Plaintiff alleges on information and belief that the agency-side requests, access, and use occurred in Bibb, Dooly, and Monroe Counties. The native session records will establish the precise terminal locations and execution details; the existing exhibits are not represented as a complete IP-address or server-location audit.

14. The connection to Flock's own alleged wrongs is direct. Count I challenges the design and continuing operation of the safeguards applied when Flock furnished and processed those local-agency searches. Count II concerns Flock's alleged custody and handling of data for those agency operations and its own compliance with applicable contractor duties. Count III challenges Flock's own alleged electronic retrieval and delivery of historical information in response to those searches. The local service transactions are thus part of the alleged tortious operation and disclosure itself, not merely background events or the presence of potential witnesses. Plaintiff relies on Flock's own service performance and alleged omissions in those transactions, not on attributing the officers' separate motives or

conduct to Flock. See Jenkins Brick Co. v. Bremer, 321 F.3d 1366, 1371-72 (11th Cir. 2003).

15. Flock's Atlanta headquarters and any design decisions or server operations outside this District do not make this District the location of every corporate act, and Plaintiff does not allege that all relevant conduct occurred here. Section 1391(b)(2) requires a substantial part, not the exclusive location, of the events giving rise to the claims. The pleaded local service transactions independently supply that connection. Venue is not based solely on the October 2024 traffic stops, Plaintiff's mailing address, the location of his vehicle, or the existence of another lawsuit. Plaintiff does not rely on the fallback provision of § 1391(b)(3).

16. The Macon Division is the appropriate division under this Court's Local Rule 3.4 because a substantial part of the claim-related agency operations occurred in Bibb, Dooly, and Monroe Counties, all of which are served by the Macon Division under this Court's published administrative division assignments. The Macon filing is supported by those operative facts, not by an assumption that a Georgia corporate defendant must be sued only where its headquarters are located.

17. Plaintiff discloses the related action, No. 5:26-cv-00204-MTT. The November 10, 2026 order, ECF No. 138, permitted an amendment against current defendants and denied requests to add additional defendants without

prejudice. Plaintiff filed his Second Amended Complaint in that action on November 18, 2026 as ECF No. 142. This is a new, separate action against Flock on its own alleged duties, not an amendment adding Flock to that action. Plaintiff invokes independent diversity jurisdiction here and does not treat the prior order as a merits ruling on these claims or as advance approval of this action. Plaintiff seeks no duplicate recovery, automatic consolidation, or entitlement to a particular judicial assignment.

## III. THE VEHICLES, THE RECORDED SEARCHES, AND THEIR LIMITS

18. On October 15, 2024, Plaintiff drove a black Ford Expedition rental vehicle, plate DZWA08, through Georgia. Dooly and Turner County officers stopped that rental vehicle. Dooly issued citation 802024406 for following too closely. The subsequent disputes and lawsuits arose from those stops and the handling of official records. Plaintiff does not sue Flock for the stops.

19. Plaintiff separately owned and used a white Ram ProMaster City bearing Florida license plate AR36BV. That vehicle, and not the rented Expedition, was the object of the person-specific Flock inquiries at issue. The two plates and vehicles are not interchangeable.

20. Plaintiff sought government records, criticized official conduct, and filed a Dooly County Superior Court civil action commenced May 6, 2025. Plaintiff denies writing, sending, causing, or authorizing anonymous

threatening letters discussed by Dooly officials. The alleged motive and culpability of those officials are disputed matters, not facts automatically attributable to Flock.

21. A public ALPR audit-detail record identifies a May 7, 2025, 4:51 p.m. EDT Bibb County Sheriff's Office query of plate AR36BV associated with user Lindsay Eschenbach, a Florida filter, the stated reason "intel," and case number 802024406 - the number associated with the stop of the different rental vehicle. The selected retrospective window extended from March 3 to May 8, 2025 and was labeled 66 days; the reported query scope was 13,270 devices across 701 networks. Exhibit A.

22. A second public Bibb detail entry dated June 2, 2025 is associated with the same named account, describes a window labeled 30 days, reports 13,439 devices across 701 networks, and states "Daytime search for best result" as the reason. Exhibit A. Plaintiff does not allege solely from the name on the account that the same person manually operated every native search session.

23. In her July 1, 2026 sworn affidavit, Lindsay Eschenbach acknowledged receiving a request from the Dooly County Sheriff's Office to search its Flock database for AR36BV, asking for a case number, receiving both 802024406 and 250501494, and exercising discretion to perform the search. The affidavit does not identify the individual requester or the precise

request date. It neither states that her employment ended on May 7 nor establishes the absence of a Flock policy. Exhibit B.

24. At the September 10, 2026 hearing, Peavy said he believed investigators had unique credentials and could ask another agency to search on Dooly's behalf. Asked whether such a request would normally be documented, he answered, "It should be," but could not identify the recording location. Exhibit H, Tr. 85:5-22. Together with Lindsay's affidavit, this identifies a concrete interagency transaction whose requester, timing, supplied purpose, authorization, and resulting access are material to the pleaded safeguard failures. The testimony does not establish what Flock knew at the time or prove a specific platform configuration.

25. A public agency/account index reports 56 Bibb search records associated with Lindsay Eschenbach, 15 associated with an account literally labeled "DO NOT USE" and operator "R. Esc," and five Monroe County Sheriff's Office records associated with Anthony Thompson: 76 displayed records in the relevant index. The 76 figure is an unverified public-index count that may include differently redacted copies; it is not pleaded as 76 distinct human decisions or an audited total. Exhibit A.

26. The identified "R. Esc" public detail records are dated July 13, September 3, and November 13, 2025 and select seven-, fourteen-, and seven-day historical windows, respectively, each using a Florida filter. The July

entry identifies 250501494; the later entries identify "212-09.03.2025-001" and "212-11.10.2025-001." At the related hearing, Sheriff Steven Craig Peavy identified Richard Eschenbach as a Dooly search operator and as the preparer of the Investigative Case Summary. The name fragment, testimony, and matching investigative identifier support the attribution, subject to native account/session confirmation. Plaintiff acknowledges that an investigative file numbered 250501494 existed; he disputes its asserted justification. The account label "DO NOT USE" is reproduced as reported, not represented to be an agency's formal name. Exhibit A, source entries; Exhibit H, Tr. 92-93, 98.

27. Monroe's produced Organization Audit contains five rows naming Anthony Thompson and AR36BV, each with reason "Ts," case field "Na," and filter "All Images." The overlapping selected windows reach from November 18 through November 30, 2025. The execution-time column in the supplied audit is clipped; Plaintiff does not reconstruct missing timestamps or invent meanings for the abbreviations. An associated public November 30 entry reports a seven-day window and 98,822 devices across 6,397 networks. Those scope figures are not counts of actual vehicle sightings. Exhibit A.

28. The six detailed public entries disclosing device counts total 175,664 device inclusions within selected query scopes, not 175,664 unique cameras, actual vehicle sightings, or separate persons. The known selected windows

reach from March 3 through November 30, 2025, an outside span of 272 elapsed days with gaps, not continuous tracking throughout that span. The presently identified records are not pleaded as an exhaustive inventory of all activity. On information and belief, additional responsive audit information was generated for the repeated agency-account transactions; the basis is the recorded queries, admitted search, actual Monroe audit, and described platform functions. The quantity and contents of any additional records remain to be established. Exhibits A, B, G, and L.

29. Plaintiff presently lacks the complete native search/result records, actual matching returns, locations, views, downloads, exports, onward recipients, user-access history, cross-network permissions, configuration history, and supervisory alerts. He alleges on information and belief that at least some executed queries retrieved and enabled review of available matching stored observations. That inference rests on the repeated person-specific queries, overlapping windows, Lindsay's admitted request and search, and Peavy's acknowledged interest in Plaintiff's whereabouts. It does not rest solely on the system's theoretical capacity. Plaintiff does not allege that every query returned a hit, that a particular private destination was observed, or that the selected date span equals the period for which underlying captures were retained. Exhibits A, B, and H, Tr. 92-94.

## IV. THE CONTESTED INVESTIGATIVE RATIONALE AND NOVEMBER 2026 RECORDS

30. Dooly's Investigative Case Summary asserted that officials compared threatening letters with handwriting on a $218 postal money order used to initiate Plaintiff's Dooly civil lawsuit, and described an April 22, 2025 GBI contact at the Perry Region 13 office involving investigator Richard Eschenbach, Sheriff Peavy, and Special Agent Tyler Sluka. A Dooly litigation response expressly stated that GBI took the money order on April 22. Plaintiff disputes that account and the claimed attribution of the letters to him. Exhibit C.

31. Plaintiff purchased the specific $218 USPS money order on May 1, 2025. The contemporaneous retail receipt identifies that amount and the instrument's serial number ending 6291, matching the money order pictured in the investigative comparison. Exhibit I; Exhibit C, comparison and enlargement. This receipt independently corroborates issuance, rather than leaving the date dependent only on a faint enlargement. The instrument could not have been transferred to GBI on April 22, before it existed. Plaintiff mailed it with the initiating papers for his Dooly civil action; the docket lists May 6, 2025 as the case-initiation date. The docket date does not establish the physical delivery time or when an officer first obtained the instrument or an image.

32. On November 9, 2026, Peavy and Richard Eschenbach expressly conceded in their response in No. 5:26-cv-00204-MTT, ECF No. 131 at 3, that the May 1 money order could not have been presented to GBI on April 22. They argued that a GBI record concerning a package of handwritten notes received May 16 might account for the instrument, while stating that counsel had requested additional GBI records to verify the supposition. Exhibit D.

33. The four-page GBI Legacy FACE/evidence material identifies an actual April 22 request for assistance concerning a threatening letter, attempted fingerprint processing, and contact with the FBI to trace the letter's origin. The evidence entries identify Lowthorpe as collecting the Peavy letter at the Dooly Sheriff's Office on April 22, a different agent collecting the Governor letter on April 29, and Sluka collecting a package of "various handwritten notes" at Region 13 on May 16. The package entry does not identify Plaintiff's money order, its serial number, or a handwriting comparison date. These collector, location, and date entries materially differ from the Dooly Summary's account. Plaintiff does not deny that GBI assisted with an actual threatening letter; he disputes the asserted connection to him and the chronology used to justify the searches. Exhibit E.

33A. On November 17, 2026, the Georgia Bureau of Investigation answered Plaintiff's targeted request R004064-101326 after reviewing its files. Item 3 specifically identified the $218 USPS money order issued May 1,

2025, with serial number ending 6291, and requested records concerning its acquisition, receipt, examination, comparison, copying, storage, transfer, or disposition, including receipt of an image. GBI answered, "No responsive records." The agency invoked to support the asserted transfer account produced no record documenting receipt of this identified instrument or its image, including an identification of it within the May 16 package. Exhibit N, source S-4 and S-23.

33B. The newly produced CC42176 entry describes a "PACKAGE CONTAINING VARIOUS HANDWRITTEN NOTES," collected by Sluka at Region 13 on May 16, 2025. It supplies no itemized contents, money-order amount, serial number, or attribution to Plaintiff. The targeted response and the generic entry do not substantiate the proposed explanation that Plaintiff's particular money order was included, or establish when anyone obtained, compared, or communicated it before the May 7 search. Plaintiff relies on this concrete absence of requested corroboration together with the affirmative chronological contradictions; he does not represent the response as a physical inventory conclusively establishing the package's contents. Exhibit N, source S-15 and S-23.

33C. GBI also reported no responsive records for the requested April 22 meeting and attendance documentation, electronic revision and audit records, and official travel and location documentation. Its production included Dooly

incident report No. 250402556, whose supplemental entry bears April 21, 2025 at 10:23 and states that Cape Jones released the letter and envelope to Sluka, without separately dating that handoff. The supplied initial report identifies neither Plaintiff nor his money order. GBI's evidence record instead identifies Lowthorpe as collecting the Peavy letter at the Dooly Sheriff's Office on April 22. The later Dooly Summary describes the Perry encounter addressed in paragraph 30. The produced materials supply no documented sequence reconciling those collector and location accounts. Exhibit N, source S-13, S-17-S-19, and S-23; Exhibit P, complete seven-page Summary. The no-record answers alone do not establish that a meeting did not occur.

33D. The supplied GBI assistance report records three hours of work, attempted latent-fingerprint processing, contact with the Macon FBI office to trace the letter's origin, and "No further assistance was provided." The produced April 25 Sluka-to-FBI communication and accompanying photograph document a communication; they supply no handwriting identification, fingerprint match, or identified money-order comparison attributing a threatening letter to Plaintiff. Plaintiff relies on the actual scope of those records rather than treating an agency's participation as a forensic identification. Exhibit N, source S-12, S-16, and S-20-S-21.

33E. The production followed documented attention from GBI Director Chris Hosey, Legal Division Director Laura McDonald, and Senior Open

Records Manager Cheryl Savage. On November 4, Hosey stated that he had discussed the request with McDonald; McDonald stated that Region 13 had forwarded documents to Open Records for review; and Savage subsequently confirmed work on the requests. Exhibit O, source T-3-T-6. The correspondence establishes the documented production path, not a personal certification by the Director that every repository was searched. Plaintiff offers these new records as additional support for disputing the asserted investigative purpose of the identified searches, without attributing the officers' alleged fabrication or knowledge to Flock or treating a November 2026 production as Flock's knowledge in 2025.

34. The May 7 query followed the listed commencement of the Dooly civil action and preceded the GBI's identified May 16 package intake. The November 9 response's suggested May 16 transfer does not establish when anyone first obtained or compared the money order or requested a search. The November 17 targeted production did not supply the asserted identification of the money order in that package. A later transfer would not, by itself, disprove a comparison occurring before May 7. Plaintiff does not invent the missing acquisition, comparison, or request dates, or treat the May 6 docket entry as proof of when any particular officer learned of the lawsuit. The proved issuance date, disputed earlier sequence, and unestablished contemporaneous justification frame the factual dispute; they do not

establish that Flock authored or knew of the disputed account. Exhibits A, C-E, H, I, and N-P.

35. Plaintiff alleges that the contested chronology and the use of a traffic citation associated with another vehicle are evidence supporting his claim that certain law-enforcement actors may have used investigative machinery to scrutinize and falsely implicate a critic in threatening conduct. Those are allegations against the actors. Flock's alleged tort is different: providing, operating, and allowing repeated, wide-ranging person-specific searches without reasonable system safeguards against the foreseeable category of misuse. No officer's allegedly fabricated record or subjective motive is imputed to Flock.

36. The letters discussed threats directed at law enforcement and references to children and school buses; falsely attributing them could expose a person to suspicion of serious violent offenses. Plaintiff was not charged with sending them. He does not assert that Flock tried to frame him for domestic terrorism, drafted the letters, or made an accusation about authorship. The seriousness of the underlying alleged misuse bears on foreseeable harm and reasonable safeguards, not corporate criminal culpability.

## V. FLOCK'S PLATFORM CONTROL, NOTICE, AND ALLEGED DESIGN FAILURE

37. Flock designs and operates a hosted ALPR system that stores customer-associated captured data on cloud infrastructure, accepts authenticated searches, selects available participating networks according to settings, retrieves matched records, displays results, and generates user and organizational audit information. Agency customers maintain substantial control over users, investigations, sharing preferences, and internal policies; Flock nevertheless designs the available fields, functions, defaults, validation options, audit architecture, and support systems. Exhibits F and G.

38. Bibb's produced agreement describes the relevant division of operational responsibility. Flock grants access to its web interface and software, assists with account creation, provides technical support, may upgrade the platform, and reserves rights to interrupt or suspend service for specified malicious, unlawful, fraudulent, or unauthorized uses. The agreement also places responsibility for end-user conduct, credential security, and lawful use on the customer. Exhibit L, source pp. 10-12, §§ 2.1-2.6, 3.1-3.2. Plaintiff relies on Flock's retained functions and feasible control mechanisms, not on an assertion that the contract required Flock to preapprove every investigation or continuously investigate users.

39. The agreement limits the stated permitted purpose to crime-related and bona fide law-enforcement activity; identifies historical-location lookup

and user/network audits; leaves ownership of customer data with Bibb while licensing Flock to use it to provide services; and allows specified access, preservation, or disclosure of footage during the retention period for legal process and security, privacy, or fraud issues. Exhibit L, source pp. 4, 7, 12, 14-15. Its thirty-day footage provision is not itself proof that every administrative audit field shares that retention period. These provisions support the alleged service role, scope of control, and feasibility of safeguards. Plaintiff sues for independent tort duties, not breach of a contract to which he was not a party, and does not treat contractual suspension rights as proof of contemporaneous knowledge of these searches.

40. Bibb's General Order 865, "Flock License Plate Reader (LPR) Utilization," was effective October 17, 2023 and bears an April 2, 2025 review date. It identifies Flock as Bibb's fixed-LPR vendor and restricts use to official law-enforcement activities. It differentiates Level I access, including national lookup, from Level II access to agency and shared private cameras within Bibb; additional features require administrator authorization. It directs the agency administrator to maintain forms or electronic systems tracking LPR usage. Exhibit M, pp. 1-3. These provisions supply an actual pre-search policy and a concrete access-control framework, rather than a policy inferred from later events.

41. General Order 865 states that collected data is sent to remote servers hosted by the vendor, describes automatic deletion on a thirty-day LPR-data cycle, and limits queries and use to official investigative or intelligence gathering related to criminal activity. Personal and non-law-enforcement utilization or dissemination is prohibited. Exhibit M, pp. 3-4. Plaintiff relies on those restrictions as applicable to Flock's own holding, maintenance, and processing role under § 35-1-22(d)(2). The policy assigns training and certain administrative obligations to agency personnel; those are not automatically Flock's duties. Its retention provision concerns LPR data and does not establish how long every administrative audit field was retained. A selected search window alone is not alleged to prove an unlawful retained capture.

42. Flock's own 2025 statement describes a search reason field and permanent audit-trail preservation of searches and their stated reasons, in contrast to the generally shorter default retention for underlying camera images. Flock's 2025 public-records guide identifies organization/network audits, user-search history, 31-day dashboard downloads, and customer-success assistance for longer periods. These are published product descriptions, not proof that every particular field or record requested here remains available. Exhibit G.

43. The risk of credentialed-user abuse was publicly known before Plaintiff's searches. In November 2022, reporting described a police officer

using a Flock system to stalk his estranged wife; Flock executive Josh Thomas addressed the incident and acknowledged the importance of making misuse harder and detection easier. Shawn Loging & KWCH Staff, "Kechi police lieutenant's arrest puts Flock technology under scrutiny" (Nov. 4, 2022). This supports advance notice of a category of foreseeable misuse, not notice to Flock of Plaintiff's specific dispute in 2025.

44. In its June 19, 2025 public company statement, Flock described anticipated tools permitting agencies to require case numbers and proactive auditing alerts designed to identify unusual search activity. This establishes Flock's description of design alternatives and the timing of the planned functions; Plaintiff does not assume any feature was absent in a particular agency configuration solely because a later feature was announced, or use subsequent improvements as an automatic admission of earlier negligence. Flock Safety, "Setting the Record Straight" (published June 19, 2025), https://www.flocksafety.com/blog/statement-network-sharing-use-cases-federal-cooperation.

45. The actual search entries at issue used short or generic stated reasons such as "intel" and "Ts," one case field marked "Na," and in another instance a case number drawn from a traffic stop involving a different vehicle. These fields are circumstantial indicators; a short reason or case number is not,

standing alone, proof of wrongdoing or proof that Flock had contemporary knowledge of wrongdoing.

46. On information and belief, Flock's platform during the relevant 2025 searches permitted the recorded pattern of repeated historical queries and extensive interagency lookups without reasonably effective investigative-nexus validation or independent review adequate to the foreseeable abuse risk. The factual basis is the completed and repeated queries, their identified parameters and case/reason fields, the admitted interagency request, Flock's descriptions of its controls, and its retained contractual functions. The claimed deficiency concerns the design and operation of safeguards at the points where requests were accepted and matching information was retrieved or delivered, not merely a failure to punish an officer afterward. The produced agreement and policy establish specified roles and restrictions; they do not establish every account setting, actual alert, or employee review for any particular query. Exhibits A, B, G, L, and M.

47. Reasonable alternative safeguards would have recorded the requesting agency and individual requester, a contemporaneous investigative purpose linked to a case or incident identifier, and the stated connection between that purpose and the particular plate. Unusually broad or repetitive person-specific queries could have required a documented exception or generated prompt notice for an authorized reviewer independent of the

requester and operator. These are proposed design alternatives, not a claim that a particular platform configuration or review actually existed. They concern functions Flock designed or administered, while respecting the customer's responsibility for investigative decisions. They would not require Flock to decide guilt, impose a warrant requirement, or guarantee that no user could lie.

48. For the Bibb/Dooly transactions, a mandatory number alone would not have answered the risk: Lindsay reports receiving both 802024406 and 250501494. The proposed safeguard instead links the personal plate to a contemporaneously described activity and identifies the originating requester before the historical retrieval is approved. The traffic citation involved a different vehicle, while the purpose and chronology asserted for the separate investigative file are disputed in paragraphs 30-35. Recording that distinction and routing an unresolved purpose or unusually broad repeat request for independent review would have required an explanation beyond the presence of a number. Plaintiff alleges the failure to provide an effective purpose-and-requester gate allowed the challenged retrievals to proceed without that check; he does not allege that a legitimate inquiry into a different vehicle is inherently forbidden.

49. For Monroe's repeated November queries, the five recorded rows identify the same plate, overlapping windows, the reason "Ts," and case field

"Na." The proposed control would flag a missing or placeholder case reference and require a meaningful purpose or logged exception, and would escalate repeat plate-specific retrievals for authorized independent review. A short abbreviation would prompt clarification, not an automatic finding of misconduct. Plaintiff alleges that a functioning gate or timely repeat-query escalation would have prevented or curtailed at least some additional unauthorized access and its resulting privacy injury. For the Dooly-associated series as well, a continuing case number would not eliminate the need to identify the ongoing purpose of repeated retrospective searches. Exhibit A.

50. The proposed reviewer must be separate from the requesting or searching official; where the official directing a query has a personal stake, mere self-approval by that official would not supply the proposed protection. A designated authorized compliance reviewer could require supporting information, narrow or suspend noncompliant access, or record an urgent exception. The proposed design includes a decision point before further access, not just an audit entry after the fact. Plaintiff alleges that the recorded pattern and disputed supplied rationale would have triggered such review and that meaningful review would have reduced the alleged misuse. This is a pleaded causal inference, not a claim that every reviewer would

reject every search or that Flock must substitute its judgment for a lawful investigation.

51. The Bibb agreement already describes user and network audits, differentiated search capabilities, ongoing support, platform upgrades, and rights to interrupt or suspend specified unauthorized uses; General Order 865 describes access levels and usage tracking. Those existing functions support the pleaded feasibility of recording a requester and purpose, routing unusual queries for separate review, and limiting access within authorized settings. Plaintiff alleges on information and belief that combining those controls with the gates and review triggers described above would have prevented or shortened at least some unauthorized retrievals and resulting harm. An urgent lawful investigation could proceed through a logged emergency exception with prompt independent review. The proposal targets high-risk repetition and escalation rather than disabling ordinary lawful searches. Its comparative cost, effectiveness, and implementation remain matters for proof. Exhibits L and M.

52. The proposed legal duty attaches to Flock's own design and continuing operation of its historical-location retrieval functions, not to a guarantee that public officials will act lawfully. Maynard v. Snapchat, Inc., 313 Ga. 533, 870 S.E.2d 739 (2022), recognizes a design duty addressing reasonably foreseeable risks despite intentional third-party misuse. On

remand, the Court of Appeals required a factual causal connection between the challenged design and the particular harm. Maynard v. Snapchat, Inc., 366 Ga. App. 507, 883 S.E.2d 533 (2023). Plaintiff relies on those principles and the transaction-specific allegations above. Neither decision adjudicates ALPR-vendor liability or dispenses with proof of duty, unreasonable design, causation, and recoverable injury here.

53. Flock is a corporate person contracting to hold and maintain captured license plate data for Bibb, as supported by the service agreement and vendor-hosted-data provisions of General Order 865. O.C.G.A. § 35-1-22(a)(5), (d)(2). Subsection (d)(2) subjects such a contractor to applicable agency policies and subsection (d)(1); subsection (b) restricts access to a law-enforcement purpose, defined in subsection (a)(4). Plaintiff relies on the policy restrictions governing the custodial service as the concrete statutory-duty basis for Count II. The distinct knowing-misuse language of subsection (d)(1) is not replaced by a mere foreseeability standard, and an officer's knowledge is not imputed to Flock. Exhibits L and M.

## VI. RECORDS CORRESPONDENCE, CONTROL, AND NOTICE

54. On May 30, 2026, Plaintiff sent Flock's legal contacts and support address a written request under the Georgia Open Records Act, O.C.G.A. §§ 50-18-70 et seq., for existing non-exempt administrative audit/search-activity records concerning plate AR36BV within Georgia customer accounts. The

request identified the relevant fields and expressly did not demand all camera captures, third-party vehicle images, a new report, or individual opt-out/deletion relief. Exhibit F.

55. On May 31, Flock Support replied that customers owned the data, that the information was stored on an encrypted cloud server, that Flock was not positioned to fulfill individual requests for access, deletion, or opt-out, and that Plaintiff should approach the customer organization. It described default 30-day deletion for camera data but did not furnish the requested organization-audit records. Plaintiff promptly clarified that the request sought existing public audit records, not a consumer deletion request. Exhibit F.

56. On June 30, 2026, counsel Jackson Griner informed Plaintiff that Flock had no records responsive to the request, that the items described in a subpoena were not maintained by Flock in the ordinary course, and that Flock was not the proper custodian. Counsel separately defended the May 31 response. Plaintiff pleads this specific adverse position rather than alleging Flock was silent or never denied custody. Exhibit F.

57. Plaintiff alleges on information and belief that Flock prepared, maintained, or had the technical ability and operational role necessary to retrieve at least some existing administrative audit information generated through its hosted services. The basis includes Monroe's actual Organization

Audit, Flock's encrypted-cloud response and audit guide, and the Bibb agreement's express audit functions, service obligations, and license to process customer data. Customer ownership of data and Flock's operation of the platform are distinct matters. Plaintiff acknowledges the adverse custody and existence positions and does not assume that every requested field or historical capture remains available. Exhibits A, F, G, and L.

58. The related agency correspondence reinforces the need for native, search-specific records. On May 4, 2026, Plaintiff requested the Dooly and Bibb search histories and audits. In a May 8 preservation response, Major Randy Lamberth stated that Dooly's trial Flock access had expired in late April 2026 and that no one from Dooly had used ALPR to search Plaintiff's vehicle before Lamberth's own inquiry. Exhibit J. The recorded Richard-associated entries, Lindsay's admitted Dooly request, and Peavy's subsequent acknowledgment of Dooly searching and identification of Richard present a materially different account. Exhibits A, B, and H, Tr. 89-93. Plaintiff disputes the denial but does not attribute its authorship to Flock or assume that every agency reference to ALPR concerns the same system.

59. On June 29, 2026, Lamberth said the requested information could not be obtained locally and that software personnel had been contacted. Plaintiff copied Flock counsel Michael Goldsticker and William Story, identified Flock's stated written-authorization route, and proposed either direct

authorized disclosure or retrieval by Dooly for production. Lamberth then clarified that his follow-up concerned LPR/GCIC rather than Flock. Exhibit J, June 29 messages. That exchange does not show that Dooly actually issued the proposed authorization or retrieval instruction, or that Flock received such an instruction and refused it. It does identify the unresolved agency-to-vendor route and the notice given to Flock's counsel.

60. Monroe's May 28, 2026 production furnished an actual Organization Audit. Bibb's July 2 production furnished policies and contracts in response to a separate June portal request, SO-2026-3054; that production must not be confused with a complete response to the May 4 plate-specific audit request. Exhibits A, J, K, L, and M. Plaintiff does not allege that these agencies produced nothing. The materials presently supporting this pleading do not furnish a complete native accounting of the challenged Dooly and Bibb queries, results, reviews, and dissemination. The known entries therefore are not an established ceiling on the activity. These facts support the identified evidentiary gaps and control allegations, not an Open Records Act count against Flock, an inference that Flock destroyed records, or an automatic finding of coordinated concealment.

61. The narrowed records request described existing, responsive, reasonably segregable non-exempt search/audit records for the Bibb, Dooly, and Monroe accounts and the identified "R. Esc" activity involving AR36BV,

including existing audit data concerning those specific searches in the customer networks queried. Plaintiff offered to accept lawful redactions, statutory exemptions, reasonable search costs, and ordinary available export methods; the request did not seek a new nationwide aggregation or disclosure of exempt raw captured plate data under O.C.G.A. § 35-1-22(f). The historical request is described here as context, not as a separate claim for statutory production relief.

62. The request and correspondence occurred after the searches. They do not establish that Flock was contemporaneously aware of the alleged misuse in 2025. They are pleaded as background bearing on the disputed existence and control of audit evidence, the operation of the hosted service, and notice of the records dispute. Plaintiff does not seek an Open Records Act penalty or production injunction in this complaint, and does not allege that nonproduction alone proves destruction or creates an independent damages claim for spoliation. Any preservation or discovery relief will be sought through the applicable procedures in this action.

## VII. INJURIES, CAUSATION, AND LIMITS

63. Plaintiff alleges loss of privacy and control over his personal vehicle's accumulated historical-location information and sustained fear, hypervigilance, disrupted sleep, reduced appetite, and difficulty carrying out ordinary activities after learning of the searches. The resulting privacy-

related fear burdened his travel planning and confidence and made him reluctant to remain outside courthouses. Plaintiff sought psychiatric care beginning July 6, 2026 and therapy beginning July 13, 2026; his reported symptoms and treatment continued over multiple months. He seeks only the portion caused or aggravated by Flock's actionable conduct, not injuries independently caused by another person's publication or accusation. No medical record is offered as an expert conclusion of Flock's liability.

64. The damages theories are distinct. For Count III's alleged intentional intrusion, Plaintiff seeks compensation for the invasion of his private affairs, the resulting injury to his peace, happiness, and feelings, and causally related treatment expenses where legally recoverable. For Counts I and II, Plaintiff seeks only injury and loss recoverable under the applicable duty and mental-state requirements, rather than importing an intentional tort's damages measure into ordinary negligence. No sum is invented for treatment bills, lost earnings, a terminated business relationship, or security expenditures. The emotional effects described are allegations of actual experience, not proof that every query yielded a hit or that an officer planned physical harm.

65. Plaintiff does not rely on psychological-treatment expenses, or economic consequences of distress alone, as the independent pecuniary loss needed to avoid Georgia's ordinary-negligence impact rule. See Mayorga v.

Benton, 364 Ga. App. 665, 875 S.E.2d 908 (2022). No physical impact or separate business loss is alleged on this record. The invasion of personal privacy is the asserted direct injury; its legal sufficiency for recovery under each theory must be established separately. The intentional-intrusion claim seeks its own legally recognized privacy and associated mental-injury damages. O.C.G.A. § 51-12-6 supplies a measure, not an independent tort; if the entire compensable injury falls within that section, Plaintiff does not seek an additional punitive award prohibited by it.

66. Plaintiff does not seek multiple awards for the same loss across this case and No. 5:26-cv-00204-MTT. The number of devices or public-index records is not a per-device or per-query measure of compensatory or punitive damages.

## VIII. COUNTS FOR RELIEF

### COUNT I - NEGLIGENT DESIGN AND OPERATION (GEORGIA LAW)

67. For Count I only, Plaintiff incorporates paragraphs 1-53 and 63-66 as pertinent to Flock's own design and operation, the identified transactions, foreseeability, causation, and injury. Paragraphs 30-35, including 33A-33E, are incorporated solely for the objective chronology and factual basis for disputing the asserted investigative purpose, not to attribute an officer's intent or knowledge to Flock. The later records correspondence is not offered to establish contemporaneous notice in 2025.

68. Flock owed Plaintiff a duty of reasonable care in selecting and operating the design of the identified search, retrieval, access-control, and audit functions to reduce the reasonably foreseeable risk of personal or retaliatory misuse injuring persons whose stored location information the service made searchable. Plaintiff relies on Maynard's design-duty principles, the retained functions identified in Exhibits L and G, and the concrete alternatives in paragraphs 47-51. This is a claim concerning Flock's own choices, not strict liability for every wrongful customer search.

69. Flock breached that duty by choosing and operating controls that, on information and belief, accepted the described broad and repeated plate-specific requests without the meaningful investigative-nexus, requester-identification, and independent-review safeguards described in paragraphs 46-51. The risk was not merely that someone might lie in a text field; it was that the system would execute and repeat historical-location retrievals without a reasonably effective gate or escalation when the recorded information called for further review. Plaintiff alleges the proposed targeted controls offered a reasonable reduction of that foreseeable risk without eliminating legitimate investigative utility. The actual implementation and comparative burden remain matters of proof.

70. The alleged causal sequence is a specified safeguard deficiency at acceptance or escalation, execution of the identified non-law-enforcement

retrievals, additional access that meaningful review would have interrupted, and resulting invasion of Plaintiff's privacy. The Bibb/Dooly and Monroe pathways are particularized in paragraphs 48-50; the claim is not based solely on the proposition that the searches could not occur without the product. Intentional misuse was the foreseeable category of conduct the proposed safeguards addressed, rather than an unrelated event. Plaintiff alleges those deficiencies were actual and proximate causes of at least part of his injury, while recognizing that recording a case number or sending an alert would not invariably prevent a determined officer's misconduct.

71. Count I seeks damages for legally cognizable injury actually and proximately caused by Flock's negligent design or operation, subject to paragraph 65. It does not seek ordinary-negligence emotional-distress damages based solely on treatment bills, characterize distress-related expenses as a separate qualifying injury, or treat an allegation of negligence as sufficient to establish an intentional privacy tort. Recovery under the distinct intrusion theory is sought in Count III.

## COUNT II - BREACH OF APPLICABLE STATUTORY PROTECTIVE DUTY (ALTERNATIVE GEORGIA LAW THEORY)

72. For Count II only, Plaintiff incorporates paragraphs 5-53 and 63-66 as pertinent to contractor custody, the applicable policy, the specific transactions, purpose, causation, and injury. Paragraphs 30-35, including

33A-33E, supply the objective basis for disputing the investigative rationale, not corporate knowledge by imputation. Plaintiff does not incorporate Count I's breach conclusion as an automatic violation of the statute.

73. O.C.G.A. § 35-1-22(a)(5) includes corporations as persons. Section 35-1-22(d)(2) expressly subjects a person contracting to hold and maintain agency plate data to the agency's policies and subsection (d)(1). General Order 865 limits data use to official investigative and intelligence gathering related to criminal activity, prohibits personal and non-law-enforcement utilization or dissemination, and places the database on vendor-hosted servers. Exhibit M, pp. 3-4. Flock's Bibb agreement identifies its custody and service role. Exhibit L. Plaintiff, whose captured plate data was allegedly retrieved and used, belongs to the class protected by those access restrictions, and the alleged non-law-enforcement invasion is the type of harm those restrictions address.

74. Plaintiff alleges on information and belief that Flock, through the hosted functions it retained and operated, held, selected, retrieved, and made available at least some matching historical observations in the challenged Bibb-account transactions for the non-law-enforcement use alleged above. That allegation rests on the service agreement, the policy's vendor-hosting provision, the completed query records, Lindsay's admitted Dooly-requested search, and the repeat transactions, together with paragraph 29's express

limits on known results. In maintaining and processing those records for that access, Flock allegedly failed to conform its own custodial service to the applicable purpose and use restrictions imposed through § 35-1-22(d)(2). The breach asserted here concerns Flock's handling of the data, not merely a customer's breach of an employment rule.

75. This Count seeks civil recovery under O.C.G.A. § 51-1-6, read with § 9-2-8(b), for breach of the specifically identified contractor duty; it does not infer a free-standing damages action from a criminal penalty. The policy-based duty is distinguished from subsection (d)(1)'s knowing-misuse prohibition. This pleading does not assert that routine automated processing, a short reason field, general awareness of misuse elsewhere, or a 2026 preservation letter alone proves Flock knew the particular 2025 searches had an improper purpose. Any theory requiring that knowledge requires a supported showing of Flock's own knowledge. Plaintiff alleges the policy-linked breach caused or prolonged the described unauthorized retrievals and resulting legally recoverable injury, subject to paragraphs 64-66. The alternative theory does not shift the agency's employee-training or investigative duties wholesale to Flock.

**COUNT III - INTRUSION UPON SECLUSION (ALTERNATIVE GEORGIA TORT)**

76. For Count III only, Plaintiff incorporates paragraphs 5-53 and 63-66 insofar as they concern Flock's own retrieval and display of Plaintiff's stored records, the nature and purpose of the transactions, and the resulting privacy injury. Paragraphs 30-35, including 33A-33E, concern the disputed rationale, not an imputation of an officer's animus, fabrication, or personal knowledge. Foreseeability alleged for negligence is not substituted for the intent required by this Count.

77. The private affairs at issue are the assembled, person-specific history of Plaintiff's movements and associations obtainable by retrieving and connecting stored observations of his personal vehicle across time and networks. Plaintiff challenges the repeated retrieval and examination of that history for the alleged non-law-enforcement purpose, without his consent, rather than one unobtrusive sighting of a publicly visible plate. See Anderson v. Mergenhagen, 283 Ga. App. 546, 550-52, 642 S.E.2d 105 (2007) (recognizing that intrusive surveillance may exceed unobtrusive public observation). Plaintiff alleges the repetition, retrospective selection, cross-agency reach, and asserted use against a litigation adversary made the particular intrusion unreasonable and highly offensive. The precise returned observations remain subject to paragraph 29; no specific private destination is invented.

78. The intentional acts alleged against Flock are selection, retrieval, and display of the stored records responsive to the identified personal-plate queries through the hosted functions Flock deliberately operated. On information and belief, at least some of Plaintiff's matching records were actually retrieved and made available, for the reasons stated in paragraph 29. The Bibb agreement describes this historical-location lookup as a function of Flock's continuing service, not merely equipment delivered and thereafter operated entirely by another entity. Exhibits A, B, and L. Plaintiff alleges that Flock's performance of those person-specific retrievals was an affirmative participation in the intrusion, distinct from negligent failure to foresee misuse. That is an allegation of intentional record access, not an unsupported allegation that a Flock employee personally viewed the records, authored a false report, or shared an officer's motive. The sufficiency of this corporate-conduct theory remains subject to the separate intent and private-affairs elements of the tort.

79. The actionable intrusion alleged in this Count directly injured Plaintiff's privacy and caused or aggravated the sustained mental injury described in paragraph 63. Plaintiff seeks general damages for that intentional privacy injury and its consequences, and proven treatment expenses only where recoverable as damages flowing from this tort. If the entire injury is to peace, happiness, or feelings, he invokes the measure in

O.C.G.A. § 51-12-6 and does not also seek punitive damages prohibited by that section. He seeks no duplicate recovery among counts or actions. His theory does not depend on physical impact or on reclassifying treatment expenses as an independent economic injury for a negligence claim.

## IX. DAMAGES, JURY DEMAND, AND PRAYER FOR RELIEF

80. Plaintiff requests trial by jury under Federal Rule of Civil Procedure 38 on all issues triable of right to a jury.

## PRAYER FOR RELIEF

A. Enter judgment against Flock on each tort count proved, for injuries legally recoverable and actually and proximately caused by Flock;

B. Award compensatory damages for the intentional privacy intrusion and associated mental injury, and proven treatment expense where recoverable under that tort; award under Counts I and II only damages meeting their separate legal requirements, without treating emotional-distress treatment bills alone as an independent pecuniary injury and without duplication among counts or actions;

C. Award punitive damages under O.C.G.A. § 51-12-5.1 only upon the required clear-and-convincing showing concerning Flock, subject to statutory and constitutional limits; do not award punitive damages in an action governed by the prohibition in § 51-12-6;

D. Award taxable court costs and other litigation expenses where independently authorized by law, including O.C.G.A. § 13-6-11 only upon a legally sufficient showing of bad faith in the underlying transaction or qualifying unnecessary trouble and expense, excluding the value of Plaintiff's own pro se time;

E. Provide appropriate preservation of relevant native query and result records, user/account attribution, interagency request communications, access and export histories, configuration history, and retention/deletion information through ordinary case-management and discovery procedures, without treating preservation as a standalone damages claim;

F. Prevent double recovery between this action and No. 5:26-cv-00204-MTT and grant such other relief as the Court finds lawful.

Respectfully submitted,

/s/ Kim Raymond Feaste
Kim Raymond Feaste, Plaintiff, Pro Se
20545 Blanchette Court
Dade City, Florida 33523
Telephone: (813) 997-6975
Email: rayfeaste@gmail.com
Dated: November 23, 2026